Good morning, Your Honor. If it pleases the Court, my name is Steve Moore, and I represent the appellants in this case, Louis DeGidio, Inc. and Louis DeGidio Services, Inc. We're here on appeal from the District Courts granting summary judgment on all of our claims and we are appealing the dismissal of three of those claims in particular, the violation of the Minnesota Franchise Act, the breach of contract claim, and the promissory estoppel claim. I'll start with the dismissal of the franchise claim. There's three elements to establish a franchise agreement. One is that the franchisee engages in business using the franchise or his operations, etc. The second element is that there is a community of interest between the franchisee and the franchisor. And the third element is that the franchisee pays a direct or indirect franchise fee. So the first two elements are satisfied. The District Court found that there is a community of interest and that DeGidio is using the trademark of industrial combustion. Everybody agrees with that. Both parties agree that the District Court found that. The issue here is was there a franchise fee that was paid? And we have an indirect franchise fee in this case. The operative case on the appeal is the 2010 Coins case. Now, Coins, there were two cases. One was decided on a motion for a preliminary injunction. That case, the preliminary injunction was denied. That case was appealed. And in that case, the Court found, and it was affirmed on appeal, that there was no franchise fee paid. But the record wasn't fully developed at that time. As I said, that was at a preliminary injunction stage. When the case came back and continued on, and in 2010, there was, at the summary judgment stage, there was the argument from the franchiseor that there was no franchise fee paid. And the record had been developed. And what happened in that case, or what the facts are in that case, is there were, there was a minimum sales volume requirement. You know, we can read these cases. Okay. Let's get to the district court's analysis that there was nothing required here. Right. And that's the key. The district court, that's a factual determination. That's why we're here. Okay. That's a factual determination that the district court made based on the record. But it went, the court made a factual determination. Coins says it's not the district court's job at summary judgment to determine whose argument's true. Well, counsel, didn't, and this is Judge Kobus on the line, didn't your client admit below that there were purchases from third-party vendors, and tried to minimize it, that there were very little? But that suggests to me that the option was at least there, and there was no requirement. If I heard that right, you say you was... I thought your client or counsel below admitted that there were purchases from third-party vendors, and that seems to me to undermine your suggestion that there was a requirement. Yeah, I understand your question, Your Honor. There was this, what they called a price match policy. So if there was a third-party vendor part, the DIGITIO would go out and potentially purchase that part from the third party. Let's say the part costs $100, and industrial combustion was also selling the same part. And let's say industrial combustion is selling that part for $120. DIGITIO could go to industrial combustion, say I can get the part cheaper at $100, and then industrial combustion would decide whether or not they wanted to match that price. And you're right. They could. Were they required to? To match the price? No, no. I'm not talking about whether or not industrial was required to match the price. Clearly, there was an election on their part. The question was, were you required before, were your clients required to DIGITIO or DIGITIO before they purchased a part to go to industrial and say, I can find it for less? And I thought the record kind of said that they didn't have to do that, that they just could go out and buy the stuff if they wanted to, or they could seek a price match if they or whatever, we're going to call that thing when we finally get around to deciding it. That's correct. They did not have to buy that part, or they did not have to seek from industrial combustion whether or not industrial combustion would match the price. They did not have to do that. That's correct. And so the district court was right then when they said that you weren't really required to buy anything from industrial. No. Because that was at above wholesale price. Right, right. With the district court. If you could find a wholesaler who was going to sell the part to you, you could buy it at wholesale. If you could find it cheaper at retail, you could buy it at retail. No, we couldn't find that part at wholesale. That was not an option. Every vendor that was selling those parts, they were retail prices, including industrial combustion. Those were retail prices, not wholesale prices. So we didn't have the option to get wholesale prices. I guess that's right because it's all OEM replacement property, right? And the original manufacturer is the guy who's like the wholesaling this stuff at that point, right? Correct, correct. The voluntary purchase, that's getting very finite on this issue. You have to step back and look at we had these target goals. We had these targets. There is this target goal that has to be met. And the parts, Your Honor, it's not just, you don't just put in a boiler. You have to have the parts to put in the boiler. And you have to have the parts to service the boiler. You know, you're off talking about the relationships and what we're looking for is an indirect fee. Correct. How many dollars did they pay for OEM parts over and above what was out there in the marketplace? Your Honor, it's on page... There's a reference to wholesale price in the statute itself. And nobody gives me the statute and I can't put my hands on the language. But there's a reference to wholesale price in the MFA definition of franchise fee, as I recall reading it last week. And now you just said these are all retail prices. So why does this even arguably comprise an indirect fee that makes your client a franchisee? Because the indirect fee says that if you purchase, if you're required to purchase product at prices above wholesale prices. Yeah. That's a franchise fee. If you couple that with... No, but it has to be different. He's not buying wholesale. These purchases don't even apply, as I read this. Or what Minnesota case says that an OEM purchase of this kind would even qualify as an indirect franchise fee? Well, that's where it gets wrapped up with the sales targets, Your Honor. We have to buy these products and we have to... You're wrapping it up, but where's the Minnesota case law that takes the statutory language and applies it to this situation? Well, there isn't one directly on point, Your Honor, that says if you're buying at retail, and is that your question? You're buying a part you need, you're buying at retail. Correct. You have the option to buy it from your wholesale supplier, who you want to call a franchisor. But you can also go out to any retail. So you can go to Home Depot or anywhere and buy the same thing. And if Home Depot will sell it to you cheaper, you can buy it there. How in the world can that be an indirect franchise fee? Your Honor, because we have to meet these sales goals and it's included. Those sales are included in the goals. If we don't make those sales purchases from industrial combustion, we're not going to reach those sales targets. Well, that does have... You know, I think that's irrelevant. I know it was in, I think, at least the reply brief. And I understand the argument. But it strikes me as irrelevant. I mean, you could meet the sales goal anywhere. And if you can't meet the sales goal, you're not going to be a franchisee or a distributor or a sales representative. Your Honor, and I know industrial combustion's made that argument, you can make the sales goal anywhere. That's not accurate. We cannot make that sales goal anywhere. As I said, when we buy the burners, we have to buy the parts. And we have to get those parts. And this is all wrapped up... Where does the have to come from? From the target... Oh, yeah, you just said have to. You could sell more burners, right? You could sell more burners, like 3X, not buy a single one of these other parts, and you'd still meet the sales goal, right? And so you were never actually, you know, because what you're saying is really a kind of a factual impossibility argument, but it's not legally impossible, right? Because you're saying we could never have met the $100,000 sale target if we didn't buy some of these parts, because we just weren't selling enough burners to get there, right? Now, that's a fact-laden question. But, you know, in the world of contacts, we're always talking about, well, impossibility is a totally different animal because it's got to be more than merely factually impossible. It's got to be truly impossible. Well, correct, Your Honor, but it does, that does play into how are we going to reach this target? If we can't, as you said, if we don't have enough burner sales to get that target goal, we then have to buy the parts. And, of course, they're trying to get you to grow the burner sales, right? Because that's where the money is for them. Sure, sure. Right. Okay. I'm running low on time. I'm going to save rebuttal, but I'd like to get into the other two claims real quick, the contract. And I'd like to distinguish our situation from it, and we do it in the brief, but from the Minnesota-Delhi case. Industrial combustion relies heavily on the Minnesota-Delhi case to say that our situation is the same as that. It's not. Our situation, as we said in the facts, industrial combustion told James DeGidios that you will be the distributor as long as you perform adequately, as you have for the last 50 years. That's a very specific term. You get into the Minnesota-Delhi case, that's talking about, you know, we won't touch you as long as you grow the territory satisfactorily. Those are very general terms. We won't touch you. Minnesota-Delhi is factually distinguishable. I see the relevant authority issue quite a bit differently. The defendant argues that the Roode case trumps the Roggling, however you pronounce the case, on which you heavily rely. Correct. And Minnesota-Delhi cites Cedars-Strand, doesn't even cite Roggling. So it seems to me that your suggestion that Roggling is the governing authority on this issue is simply not consistent with controlling law. Your Honor, I would, of course, beg to differ. But if you look at the Minnesota-Delhi case... You're talking about an intermediate Minnesota appellate court competing with a Minnesota Supreme Court. Correct. But the facts in that case, again, are different. That's when the situation where they say... The facts in that case are, you know, good employees are taken care of. Okay. Well, what does that mean? The court in that case says that's a general term. Or just a general statement. Good employees are taken care of. There's no finite date for termination in that case. I'd like to point out the Minnesota-Delhi case does cite the law of Minnesota from the Benson-Creamery case. And specifically, the Minnesota-Delhi case says... That's what we have here. That's the testimony. That's the evidence that we presented to the court. And that summary judgment is not the court's job to decide whether or not that's a strong argument. That's a jury decision. So the law is still the same. And Minnesota-Delhi states that very clearly, relying on the Benson-Co-op-Creamery case. I'll save the last minute and change for rebuttal. Thank you. Mr. Diederich. Thank you, Your Honor. May it please the Court. Joseph Diederich for the appellees. All three of DiGidio's claims fail as a matter of law. First, as to the Franchise Act claim, DiGidio presents no evidence that it was ever required to purchase any amount of the third-party OEM parts from industrial combustion. Counsel, this is Judge Kovats on the phone. What's your understanding of the sales goal? What does the record show? What is the sales goal and when was it implemented? So, the only evidence of any sales goal with a specified number was that 2019 sales target letter. There's no language in that document suggesting there was any requirement to purchase any amount of OEM parts. It's undisputed that only OEM parts were sold at above wholesale prices. There's no dispute that both burners and either IC parts, industrial combustion parts, or OEM parts, could be used to meet the sales goal. And most importantly, in three of the five fiscal years prior to termination, I see, or excuse me, DiGidio purchased over $100,000 of burners alone from industrial combustion. That's at record 27, page 3 to 4, appendix page 28.  The 2010 unpublished order from the District of Minnesota is distinguishable. Again, in this case, we have a situation where any arguable sales goal could be met and was met with products purchased at wholesale prices. By contrast, in coins, every single one of the products that the producer sold to its distributor was sold at above wholesale prices, making that case very different. Somewhat newly on reply, DiGidio presses a theory that it had to purchase OEM parts as an incidental part of its burner business. For at least three reasons, Your Honors, that theory doesn't hold water either. Again, there's no evidence that it was ever required to purchase those OEM parts from industrial combustion. And without money flowing from the distributor to industrial combustion, there can be no franchise fee. It seems to me that the contract issues are much more factually intricate, so to speak, and would be better addressed than this franchise authority question. Certainly, I'll move on to the breach of contract action or claim. So for two separate reasons, the contract claim fails as a matter of law. First of all, because the alleged representations that John Stupak made about adequate performance are too indefinite to create a contractual term. As Your Honor correctly pointed out during my friend's presentation, Rood is a Minnesota Supreme Court case that post-states the two intermediate Court of Appeals cases that were cited. And in an eerie situation like we have here, the state high court is controlling. And even if this court were to determine that it is not exactly on point, which we maintain it is, the court's next job would be to predict how the high court would rule, not to rely on intermediate Court of Appeals cases as such. Separately and independently of any amount of definiteness that John Stupak's representations may have had or not have had, the terms of the 2007 written agreement control here. The 2007 agreement expressly provided for termination without cause. There is also a merger clause in that document that superseded all oral representations and prior agreements. There cannot be a genuine dispute that both Digitio Inc. and Digitio Services were parties to that contract. Well, as I understand the argument in reply to that, it's that the timing of the Stupak representations, if they were post-2007, they could create an express or implied amendment to the agreement. I will address that, Your Honor. So what we have here is a situation, and these are the facts undisputed that Stupak said something about adequate performance before the contract was signed, and that is alleged in the complaint at paragraph 21 and affirmed in an affidavit record 8, paragraph 12. I believe that's the correct paragraph. Forgive me if I'm mistaken. And then Digitio also argues that there was, Stupak said basically the same thing either during the signing, the physical signing of the document, or immediately after in the seconds following. Again, in the same room with the same people at the same time. I'd point you, Your Honors, to appendix page 139. That's the testimony of James Digitio as 30b-6 witness. He ultimately commits to the testimony that all of the Stupak statements were taking place as the document was being signed. What we have here is not an oral amendment to a written contract situation. What we have here is a parole evidence rule situation. This is all the same negotiation for the same ultimate written contract, and these types of sort of congratulatory remarks are not sufficient to overcome the express merger clause as well as cases like JARA, which we cite from the Minnesota Court of Appeals, which says that the parole evidence rule bars, quote, extrinsic evidence of oral promises made during negotiations. Now, in their brief, I believe it's their opening brief, perhaps their reply, Digitio cites a case called Larson v. Hills for the proposition that parties can orally amend a written contract. As a general proposition of law, that is correct, but it is not applicable here. Looking at Larson v. Hills more carefully, we have a situation where the parties executed a written agreement and then went about their ways, went separately, started performing the contract, and then two months later, from separate states, they got on the phone and said, we want to amend this contract and we need to do it orally because we're in separate states and we're on the phone. We submit to the court that that is a much different situation than a situation here where, again, same people, same time, same room, discussing a particular written instrument. And I understand that your parole evidence argument and I understand that the merger's clause and the entirety's clause and they all kind of roll everything together and say the contract is the contract is the contract, right? And then we have a line of cases that talk about promissory estoppel, right? And so if representations are being made and they're reasonably being relied upon, that that may create some obligation outside of contract. We also have some cases, well, common law generally, that if there is a contract, promissory estoppel as an equitable remedy doesn't apply. Where does this fall within these? I mean, is it impossible for someone to say like two sentences after the signing of a document, anything that would create an oral amendment to that signed document? Under the situation here, as the undisputed facts show,  that it is impossible because again, James DiGidio's testimony, although he waffles a bit, he ultimately commits in his deposition, again, appendix page 139, that no, all the stuff was being said at the time we were signing. And he also testifies that he understood the effect of the merger clause, which is at appendix page 101. He knew when he was signing what was going on. And so in this situation, given the undisputed facts, there can be no dispute that this is a situation governed by the merger clause. Yeah. And then there would be no dispute that any reliance would be unjustifiable anyhow, and so you can't meet the requirements of promissory estoppel. Correct, Your Honor. And continuing on Your Honor's point about the common law rule that when a contract exists, then promissory estoppel is barred. On reply, there's a suggestion that, at least as I read it, there's a suggestion that an oral contract does not bar promissory estoppel, but they cite no evidence for that. The cases that we cite, such as Banbury and Sacred Heart Farmers, the latter of which was a Minnesota Supreme Court case, simply say, if there is a contract, period, then promissory estoppel is barred. And here there's no dispute that at least some contract, whether written or oral, and whether it's at will or for cause, the parties don't dispute that some contract governed the relationship between industrial combustion and both de judeo entities. And so given that, there can be no promissory estoppel. Claim. I welcome the Court's questions. Otherwise, I'll conclude and say the District Court got it right. We request that this Court affirm the grant of summary judgment in its entirety. Thank you. Thank you. For rebuttal, Counsel, I'd like you to address this question of admitting all the representations were made at the time of the signing and understanding the understanding the merger clause. Also, there's the District Court thought that he conceded the representations were made to encourage the signing of the 2007 agreement. And I think the law is pretty clear that when they can performance continued after expiration, the contract continued with the same terms. So how do you how does your claim survive those factors? Because those aren't the facts, Your Honor. The de judeo testified from page I think it's 134 all the way up to in the appendix all the way up to like page 150 about the timing of this. And ultimately the timing of it, what's happening here is the contracts says the only name on the contract from our side is de judeo Inc. The contract is being signed and then James de judeo looks at Stupak and says, well, what about services? That's a different company. And Stupak then makes the comment again. You're not saying it's wrong that it was all occurred at the signing. There wasn't anything there weren't any post signing representations. There were, Your Honor. Where is the evidence of those? It's in the record. Mr. de judeo testifies to that. It's between pages 134 and about 150 in the appendix where he's going through the actual event where the contract is being signed by Inc. And once that is happening, he looks at Mr. Stupak and says, well, what about services? And that's when Stupak again makes the same statement for. That wasn't the signing. But it's after this. I mean, you know. Well, yes, yes. But you said you said then I said, OK, after the signing event. OK, you're talking like a subsequent date, like a month later, two months later, that would actually constitute either an amendment or an ovation, right? I mean, you know, because if you have a statement that's made a year later, I mean, this is a 2007 incident, right? And there doesn't seem to be any indication that any statements, promises or representations were being made more than 10 minutes following the actual execution of the contract. Is that a true statement? That is correct, Your Honor. That's what the record says. But, you know, the case law doesn't say it has to there's a time limit on when these amendments are made, if it's even considered an amendment. Now, that contract, as I said, is just between Digitio Inc. and Industrial Combustions. You have services which had been part of had been distributing for IC since 1996. And then that continues, of course, afterwards. But you've also got a representation at that point that's orally made that, yeah, they're covered by the agreement. So the terms of whatever their oral agreement are the same as in the other one, right? No, he's not saying you're covered by the agreement. He's saying you're covered by, you know, we are not going to terminate as long as you perform adequately as you have for the last 50 years. That's the statement. Got it. I guess my time's up. Thank you.